United States District Court
Southern District of Texas

**ENTERED**

March 16, 2023

Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TYRONE LEE JENKINS, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | Civil Action No. H-22-1362 |
| v. | § | |
| | § | |
| BOBBY LUMPKIN, | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, a state prisoner proceeding *pro se* and *in forma pauperis*, filed an amended complaint under 42 U.S.C. § 1983 against Texas Department of Criminal Justice ("TDCJ") official Bobby Lumpkin for permanent injunctive relief. (Docket Entry No. 17.) Lumpkin filed a motion for summary judgment (Docket Entry No. 40). Plaintiff filed a response in opposition (Docket Entries No. 42, 44), to which Lumpkin filed a reply (Docket Entry No. 45) and plaintiff filed a sur-reply (Docket Entry No. 47).

Having considered the pleadings, the motion for summary judgment, the response, the reply, the sur-reply, the exhibits, and the applicable law, the Court **GRANTS IN PART** and **DENIES IN PART** the motion for summary judgment, and **DISMISSES** this lawsuit for the reasons shown below.

### I. BACKGROUND AND CLAIMS

Plaintiff is an adherent of the Hebrew Israelite faith, which he claims mandates consumption of kosher meals three times a day, year round. He does not claim to be Jewish

or to otherwise follow Judaic law, and does not seek access to Jewish religious services,

programming, or studies.  His statement of the claim in the amended complaint reads in its

entirety as follows:

> According to TDCJ's AD-07.30 there are ONLY four units that adequately accommodate my religious beliefs which requires kosher meals year round (3 kosher meals per day).  The four units are (1) Stringfellow Unit, (2) Wynne Unit, (3) Jester III Unit, and (4) Style [*sic*] Unit. There are NO other units that can adequately accommodate my religious beliefs. *Therefore, if I am assigned to ANY unit other than one of the four mentioned above it is an infringement on my religious beliefs.*  I am currently assigned to the Robertson Unit which is obviously NOT one of the four mention [*sic*] above and in the AD-07.30 and therefore cannot adequately accommodate my religious beliefs which is also causing a substantial burden on my religious beliefs.

(Docket Entry No. 17, p. 4, original capitalizations, emphasis added.)  He argues that his

administrative grievances for transfer to one of the four named units were denied, and that

Lumpkin infringed on his First Amendment free exercise rights.  *Id.*, p. 3.  Thus, plaintiff

raises a First Amendment free exercise claim for denial of access to kosher meals.

As his sole judicial relief, plaintiff seeks injunctive relief and asks the Court to "order

TDCJ to transfer me to one of the four units that can adequately accommodate my religious

beliefs."  *Id.*

Lumpkin moves for summary judgment, and argues that plaintiff enjoys no First

Amendment free exercise right to kosher meals in prison.  Lumpkin further argues that TDCJ

has in place a formal application procedure for eligible inmates to request religious transfers

to a Jewish Designated Unit ("JDU") offering Jewish religious programming, services, and

kosher foods.  Lumpkin states that plaintiff did not comply with formal transfer application

procedures and eligibility requirements, and that unit transfers cannot be approved through the administrative grievance process.

Plaintiff counters that religious transfer applications he submitted at previous prison units did not result in his transfer, and that the transfer application process, eligibility requirements, and security clearance protocols violate his religious free exercise rights.

## II.  SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). If the movant satisfies its initial responsibility of showing "the absence of a genuine issue of material fact," the burden shifts to the nonmovant to identify "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317 106, 323 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The summary judgment process does not involve weighing the evidence or determining the truth of the matter. The task is solely to determine whether a genuine issue exists that would allow a reasonable jury to return a verdict for the nonmoving party. *Smith v. Harris County*, 956 F.3d 311, 316 (5th Cir. 2020). Disputed factual issues must be resolved in favor of the nonmoving party. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th

Cir. 1994). All reasonable inferences must also be drawn in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

### III.  FREE EXERCISE CLAIM – KOSHER FOODS

Plaintiff alleges that Lumpkin "infringed on my First Amendment rights to religion thus causing a substantial burden on my religious tenant [*sic*]" by not providing him kosher foods or transferring him to a Jewish prison unit. (Docket Entry No. 17, p. 3.) Lumpkin moves for summary judgment dismissal of this claim, as the Supreme Court and the United States Court of Appeals for the Fifth Circuit have not recognized a First Amendment free exercise right to kosher foods for prisoners. *See Baranowski v. Hart*, 486 F.3d 112, 122 (5th Cir. 2007). Indeed, the Fifth Circuit Court of Appeals has never held that inmates of *any* faith enjoy a First Amendment free exercise right to the religious diet of their choice. Because plaintiff enjoys no free exercise right to kosher meals, he enjoys no free exercise right to an injunction transferring him to a prison unit that provides kosher foods.

Plaintiff's First Amendment free exercise claim predicated on lack of access to kosher foods fails to state a viable claim for relief under section 1983, and this lawsuit is **DISMISSED WITH PREJUDICE**. Plaintiff's request for an injunction ordering his transfer to one of the four named prison units is **DENIED**, insofar as his request is predicated on the denial of kosher foods under the First Amendment.

In the alternative, the Court will consider Lumpkin's argument that plaintiff's free exercise rights were not violated by policies and procedures requiring his formal application, eligibility, and approval for transfer to a JDU.

## IV.   FREE EXERCISE CLAIM – RELIGIOUS TRANSFER

It bears repeating that, as his sole judicial relief, plaintiff asks the Court to transfer him to one of four TDCJ units – Stringfellow, Jester III, Stiles, or Wynne – so he may access kosher foods for religious purposes as a Hebrew Israelite.  Plaintiff claims, without further factual support, that he is eligible for transfer as he has a "Jewish" background (his quotation marks) with continuous study in the "Jewish" faith (again, his quotation marks).  (Docket Entry No. 42, p. 1.)  He does not seek access to, or claim denial of, Jewish services, programming, or studies, and makes no claim that he is an adherent of the Jewish faith.

Plaintiff did not grieve or plead in his amended complaint that he was denied a transfer under a TDCJ religious transfer policy or procedure or that a TDCJ religious transfer policy or procedure was unconstitutional.  To the contrary, no mention was made of a TDCJ religious transfer policy until Lumpkin filed the pending motion for summary judgment, wherein he argues that TDCJ's JDU transfer policy under Administrative Directive ("AD") 7.02 – "Reassignment Procedures to a Jewish Designated Unit" (the "Chaplaincy Policy") is constitutional.  Lumpkin argues that it was plaintiff's responsibility to apply for transfer to a JDU and meet established eligibility requirements, and that the Chaplaincy Policy is the formal TDCJ process by which such transfer is requested and evaluated.

A.   The Chaplaincy Policy

In her affidavit in support of summary judgment, TDCJ employee Pennie Kempt

testifies that she is the Deputy Director of the Rehabilitation Programs Division and performs

managerial work overseeing the daily operations and activities of rehabilitation programs,

including the Religious Services Department. (Docket Entry No. 40-13, p. 2.) Ms. Kempt

explains the Chaplaincy Policy for transfers to JDUs as follows:

> An inmate must utilize the process set out in AD-7.02 in order to obtain a unit
> transfer to a Jewish Designated Unit for religious purposes.   Chaplaincy
> utilizes the following procedure:
>
> First, under AD-7.02, an inmate must submit a request for transfer to a Jewish
> Designated Unit.  After the request is sent, the unit level chaplain initiates the
> process for a potential unit transfer, which must then be approved by the State
> Classification Committee.  This transfer process mimics TDCJ procedures
> concerning the transfer of inmates within TDCJ.  That is, during a standard
> unit transfer, the Warden approves the transfer before it is sent to the State
> Classification Committee, at which point the final decision is made.
> Regarding requests for transfer to a Jewish Designated Unit, the unit or facility
> chaplain initiates the process, which then proceeds to Chaplaincy Headquarters
> and the State Classification Committee, simultaneously.
>
> Unit transfers pursuant to AD-7.02 require this formal process in order to
> satisfy protocols followed by the State Classification Committee. Specifically,
> the State Classification Committee contemplates a variety of considerations,
> such as safety, security, and medical interests, amongst others.
>
> Moreover, AD-7.02 requires that inmates who desire reassignment submit the
> Aleph Institute Application form through Chaplaincy Headquarters in order to
> assist the lead Rabbi in determining whether the inmate is appropriate for
> transfer.  This application prevents manipulation and overburdening of the
> system by inmates claiming the need for religious accommodations when they
> are not warranted, by requiring that inmates meet specific criteria in order to
> qualify for transfer to a Jewish Designated Unit. Moreover, AD-7.02 requires
> inmates to satisfy one or more objective factors in order to qualify for transfer

to a Jewish Designated Unit.  TDCJ currently houses inmates with 266 different religious preferences.  TDCJ does not have the ability or the inclination to review each of these purported faith systems, their doctrines, rituals, beliefs, laws, or their adherent's subjective sincerity therein.  Objective criteria conferring membership in a major faith group streamline the qualification process and allow TDCJ to provide the appropriate services to inmates.

Furthermore, transfer to a Jewish Designated Unit contemplates costs.  Kosher meals are more expensive than the regular meal options TDCJ provides.  As such, TDCJ, which has been subjected to budget reductions in recent years, seeks to avoid unnecessary expenditures when the current meal program satisfies an inmate's needs.  Once the following criteria are met, an inmate may be transferred to a Jewish Designated Unit.

*Id.,* pp. 2–3.  Thus, the JDU transfer policy and process requires the prisoner to apply for transfer, meet religious eligibility and security clearance, and be approved for transfer.

TDCJ maintains two levels of JDUs:  Enhanced Jewish Designated Units and Basic Jewish Designated Units.  Pursuant to AD-7.02 (rev. 5), the Stringfellow Unit is TDCJ's Enhanced Jewish Designated Unit, which provides Jewish religious programming, kosher meals for Jewish offenders, kosher food products available through the commissary for purchase at the prisoner's expense, and holy day services.  The Jester III, Stiles, and Wynne Units are TDCJ's Basic Jewish Designated Units, which provide primary programming, kosher food products available through the commissary for purchase at the prisoner's expense, and holy day services.  (Docket Entry No. 40-14, pp. 6–7.)

A prisoner is eligible for placement in an Enhanced Jewish Designated Unit if he (a) is born of a Jewish mother, (b) has a Jewish background with continuous study in the Jewish faith, or (c) converts to Judaism according to Jewish law.  (Docket Entry No. 40-14, p. 7.)

7

Otherwise, a prisoner is eligible for transfer to a Basic Jewish Designated Unit if he (a) satisfactorily completes 30 out of the 45 lessons of the Jewish Interest Correspondence Course and (b) a contract Jewish rabbi determines the prisoner's sincerity and knowledge of the Jewish faith. *Id.* Plaintiff specifically requests transfer to either an Enhanced Jewish Designated Unit or a Basic Jewish Designated Unit.

B.     Plaintiff's Non-Compliance with the Chaplaincy Policy

Plaintiff's arguments in this summary judgment proceeding are two-fold: (1) that he was not transferred to a Jewish Designated Unit upon request and/or application, and (2) that he should not be required to apply, meet Jewish eligibility and security requirements, and be approved for transfer to a JDU. Lumpkin presents probative summary judgment evidence establishing that plaintiff did not comply with the Chaplaincy Policy in seeking transfer to a JDU between May 1, 2020 to March 30, 2022. Plaintiff, on the other hand, asks the Court to order his transfer to a JDU without regard to formal TDCJ policies and requirements for prisoner transfers to JDUs.

In her affidavit in support of summary judgment, TDCJ employee Pennie Kempt testifies in relevant part as follows:

> To prepare this affidavit, I have reviewed the Chaplaincy Records of [plaintiff] from May 1, 2020, to March 30, 2022,[1] his Grievance Records from May 1, 2020, to March 29, 2022, [and] his Classification Records from May 1, 2020,

---

[1]Plaintiff neither alleges, nor presents probative summary judgment evidence showing, that he complied with all requirements of the Chaplaincy Policy at any time from May 1, 2020, to March 30, 2022. His generalized assertions of compliance provide no time frame and do not rebut Ms. Kempt's affidavit testimony.

to April 4, 2022 . . . . I am familiar with TDCJ policies and procedures with respect to transfers to Jewish Designated Units.

*     *     *

Upon review of [plaintiff's] Grievance and Chaplaincy Records, [plaintiff] has not followed the protocols set by Chaplaincy through AD-7.02. Under this policy, [plaintiff] must submit a request for a unit transfer through the unit or facility chaplain. [Plaintiff] did not request reassignment through Chaplaincy. [He] also did not complete the requisite paperwork to be submitted to Chaplaincy, and therefore could not be processed by the State Classification Committee, which would approve or deny a request for reassignment and notify Chaplaincy headquarters.

In this instance, [plaintiff] submitted Step One and Step Two grievances regarding his request for Kosher food. In response to his Step One and Step Two Grievances, [plaintiff] was notified that he must submit his requests through Chaplaincy, instead of filing grievances. While [plaintiff] claimed in his Step Two Grievance that he filed a request for accommodations regarding Kosher food with Chaplaincy, his records reflect that he did not do so. That is, [plaintiff] was informed that he needed to submit a formal request through Chaplaincy and failed to do so.

Review of [plaintiff's] Chaplaincy file shows that he failed to submit the request for a unit transfer to Chaplaincy, a requirement under AD-7.02. As such, [he] has not utilized the proper channels for a unit transfer. Because a transfer to a Jewish Designated Unit requires evaluations and proceedings facilitated by staff trained within the TDCJ Chaplaincy department to process religious requests and approval by the State Classification Committee, the grievance process is not the appropriate avenue for requesting transfer to a Jewish Designated Unit. Specifically, transfers require communication amongst Chaplaincy staff to ensure that adequate accommodations are made, any requested programming can be offered and, ultimately, that [plaintiff] is approved by the State Classification Committee.

Furthermore, [plaintiff's] Classification Records indicate that he is a custody level G-4 inmate. G-4 inmates are higher-custody inmates in the TDCJ system, who require additional staffing and security arrangements. While there are Jewish Designated Units that allow for G-4 inmates, housing for G-4 inmates is often more limited and subject to increased security requirements,

thereby necessitating the evaluation by the State Classification Committee, pursuant to AD-7.02.

In conclusion, it is for these reasons that AD-7.02 requires that inmates follow this formal process for a unit transfer. Because [plaintiff] has not followed the appropriate process for transfer to a Jewish Designated Unit, despite being informed of the proper process for doing so, he has not been reassigned to a Jewish Designated Unit.

(Docket Entry No. 40-13, pp. 2–4, exhibit references omitted.)

Lumpkin argues in the motion for summary judgment that plaintiff failed to follow these established procedures and did not request or obtain transfer to a JDU through the Chaplaincy Policy. Prompted by Lumpkin's motion, plaintiff argues in his response that he made several formal transfer requests at various prison units. (Docket Entry No. 42.) He reports that he submitted the required Aleph Institute Application to chaplaincy staff at the Estelle, Ellis, and Polunsky Units, but he expressly fails to state that he completed the application process at his current housing, the Robertson Unit. Thus plaintiff's own response shows that he did not complete the AD-7.02 transfer application as to his current unit of confinement.

Moreover, plaintiff's own exhibits show that following his applications submitted at his previous units, the Aleph Institute confirmed that he had "no Jewish identity." As a result, he was instructed that he could complete the required Jewish course materials. Jewish course materials were sent to him on three separate occasions in 2019 and twice in 2021. As of February 26, 2021, no lessons had been completed and returned. (Docket Entry No. 47, p. 7.) In a subsequent letter dated March 25, 2022, the TDCJ Rehabilitation Programs

10

Division informed plaintiff that he had completed lessons 1 through 6, but had not completed and returned lessons 7 through 9. The latter lessons were re-sent to him. *Id.*, p. 8. As noted earlier, AD-7.02 (rev. 5) requires prisoners to satisfactorily complete 30 of the 45 Jewish Interest Correspondence Course lessons for transfer to a Basic Jewish Designated Unit. Plaintiff does not claim to have met this eligibility requirement. As a result, plaintiff's own pleadings and summary judgment responses establish that he did not complete the Chaplaincy Policy application process at the Robertson Unit, did not complete the Jewish lessons requirements, and was found by the Aleph Institute to have "no Jewish identity." Consequently, he did not meet the eligibility criteria for transfer to either an Enhanced Jewish Designated Unit or a Basic Jewish Designated Unit. Plaintiff's generalized assertions of a "Jewish" background and continuous "Jewish" studies are belied by his own allegations of not being Jewish and to adhering only to Judaic dietary requirements, and of completing only a handful of the required Jewish studies lessons. Plaintiff presents no probative summary judgment evidence that he met, or currently meets, the eligibility criteria for transfer to a JDU.

Plaintiff contends in the summary judgment proceedings that the Chaplaincy Policy violates his First Amendment free exercise rights because he should not have to apply, meet Jewish eligibility requirements, and be approved in order to be transferred to a JDU. He argues that he should be transferred notwithstanding the Chaplaincy Policy and eligibility requirements because his Hebrew Israelite faith requires consumption of kosher foods. In

making this argument, plaintiff necessarily contends that compliance with State Classification Committee and security requirements must give way to his First Amendment free exercise right to consume kosher foods at a JDU.

Lumpkin argues that the Chaplaincy Policy and procedures meet constitutional muster in that the application, eligibility, and security provisions are reasonably related to TDCJ's legitimate penological interests, as discussed below.

C.    Constitutionality of the Chaplaincy Policy

It has long been recognized that "[c]onvicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). The Constitution dictates that prisoners be afforded reasonable opportunities to exercise the religious freedom guaranteed by the First Amendment without fear of penalty. *Cruz v. Beto*, 405 U.S. 319, 322 n. 2 (1972); *Green v. McKaskle*, 788 F.2d 1116, 1126 (5th Cir. 1986). The exercise of religious freedom, however, is restricted by valid penological objectives such as deterrence of crime, rehabilitation of prisoners, and institutional security. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).

Lumpkin correctly posits that plaintiff's First Amendment challenge to the Chaplaincy Policy must be analyzed under the deferential standard set forth in *Turner v. Safley*, 482 U.S. 78 (1987). Under *Turner*, a government regulation that impinges upon an inmate's constitutional rights is valid if it is reasonably related to a legitimate penological interest. *Brown v. Collier*, 929 F.3d 218, 232 (5th Cir. 2019); *see also Davis v. Davis*, 826 F.3d 258,

265 (5th Cir. 2016) (noting that an inmate's First Amendment free exercise rights are violated when he is not afforded a reasonable opportunity to exercise his religious beliefs).

Courts generally consider four factors in determining the reasonableness of prison regulations: "(1) the existence of a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) the existence of alternative means of exercising the right that remain open to prison inmates; (3) the impact an accommodation will have on guards and other inmates, and on the allocation of prison resources generally; and (4) the absence of alternatives." *Turner*, 482 U.S. at 89–91; *Davis*, 826 F.3d at 265.

When applying these factors, the courts are to "accord substantial deference to the professional judgment of prison administrators," pursuant to the separation of powers doctrine. *Overton v. Bazzelta*, 539 U.S. 126, 132 (2003); *see also Turner*, 482 U.S. at 84–85 ("[R]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government."). However, to be entitled to summary judgment, the record must be "sufficient to demonstrate that the [p]olicy is a reasonable one." *Prison Legal News v. Livingston*, 683 F.3d 201, 215 (5th Cir. 2012) (citations and quotations omitted). The burden is on the prisoner to disprove the validity of a prison regulation. *Turner*, 482 U.S. at 84–85.

The Court will review Lumpkin's claim that the Chaplaincy Policy conforms to the *Turner* requirements.

        i.      <u>Rationally Related</u>

Under the first *Turner* factor, the Court must consider whether the Chaplaincy Policy has a logical connection or is rationally related to legitimate penological interests. *Adkins v. Kaspar*, 393 F.3d 559, 564 (5th Cir. 2004). Lumpkin argues that TDCJ's policy of restricting religious transfers to a JDU to eligible inmates who utilize the established application and approval process is rationally related to TDCJ's interests of reducing costs, efficiently allocating limited resources, ensuring effective administration, and providing security.

In support of summary judgment, Ms. Kempt testifies in her affidavit in relevant part as follows:

> This application [policy] prevents manipulation and overburdening of the system by inmates claiming the need for religious accommodations when they are not warranted, by requiring that inmates meet specific criteria in order to qualify for transfer to a Jewish Designated Unit. Moreover, AD-7.02 requires inmates to satisfy one or more objective factors in order to qualify for transfer to a Jewish Designated Unit. TDCJ currently houses inmates with 266 different religious preferences. TDCJ does not have the ability or the inclination to review each of these purported faith systems, their doctrines, rituals, beliefs, laws, or their adherent's subjective sincerity therein. Objective criteria conferring membership in a major faith group streamline the qualification process and allow TDCJ to provide the appropriate services to inmates.
>
> Furthermore, transfer to a Jewish Designated Unit contemplates costs. Kosher meals are more expensive than the regular meal options TDCJ provides. As such, TDCJ, which has been subjected to budget reductions in recent years,

seeks to avoid unnecessary expenditures when the current meal program
satisfies an inmate's needs.  Once the [applicable] criteria are met, an inmate
may be transferred to a Jewish Designated Unit.

(Docket Entry No. 40-13, pp. 2–3.)  Ms. Kempt further testified that the application process

is necessary for reasons of safety, security, and medical concerns:

Unit transfers pursuant to AD-7.02 require this formal process in order to
satisfy protocols followed by the State Classification Committee.  Specifically,
the State Classification Committee contemplates a variety of considerations,
such as safety, security, and medical interests, amongst others.

*Id.*  Ms. Kempt's testimony establishes that the application process is rationally related to

TDCJ's penological interests in reducing costs, efficiently allocating limited resources,

ensuring effective administration, and providing security, as required under *Turner*.

Plaintiff responds that the application process and relevant administrative directives

unconstitutionally require him to be classified as a G-3 or lower custody level in order to

transfer.  However, AD-7.02 makes no such requirement.  (Docket Entry No. 40-14.)  To the

contrary, Ms. Kempt testified in her affidavit that,

[Plaintiff's] Classification Records indicate that he is a custody level G-4
inmate.  G-4 inmates are higher-custody inmates in the TDCJ system, who
require additional staffing and security arrangements.  *While there are Jewish
Designated Units that allow for G-4 inmates*, housing for G-4 inmates is often
more limited and subject to increased security requirements, thereby
necessitating the evaluation by the State Classification Committee, pursuant
to AD-7.02.

(Docket Entry No. 40-13, p. 4, exhibit references omitted, emphasis added.)  Plaintiff

proffers no probative summary judgment evidence showing that he was denied transfer to a

15

JDU due to his G-4 custody classification, or that ensuring prison security is not a valid penological interest.

In addition, AD-07.30 (rev.8), "Religious Programming," provides that

The opportunity to transfer to a designated unit is limited to inmates whose custody level is G1, G2, or G3.  Inmates in G4 custody as a result of a security precaution designator code with a one-year clear major disciplinary history may also be approved for specialized religious programs.

\* \* \*

Procedures for inmates to transfer to a designated unit shall comply with the TDCJ *Chaplaincy Manual*.

(Docket Entry No. 40-12, p. 9.)  Plaintiff presents no probative summary judgment evidence showing that he was denied transfer to a JDU for security reasons despite having a one-year clear major disciplinary history.  His assertion that the Chaplaincy Policy would bar, or has barred, his transfer to a JDU based on his G-4 custody level is unsupported by probative summary judgment evidence.

The Chaplaincy Policy application and approval process meets the "rationally related" *Turner* test, and plaintiff provides no probative summary judgment evidence to the contrary.

    ii.    <u>Alternative Means to Free Exercise</u>

Under the second *Turner* factor, the Court must inquire whether plaintiff has alternate means of exercising his religious free exercise rights. *Adkins*, 393 F.3d at 564.  An inmate must be afforded a "reasonable opportunity" to exercise his religious beliefs. *Davis v. Davis*, 826 F.3d 258, 265 (5th Cir. 2016).

Lumpkin argues that plaintiff's adherence to the Hebrew Israelite faith is not completely stifled by lack of access to kosher meals or foods or by the requirement that he comply with the Chaplaincy Policy to apply for transfer to a JDU, citing *Kahey v. Jones*, 836 F.2d 948, 950 (5th Cir. 1988) (stating that the First Amendment does not require prisons to comply with prisoners' particularized religious dietary requests).   Plaintiff presents no probative summary judgment evidence that he is being denied free exercise of any other religious right or belief.

Plaintiff is afforded a reasonable opportunity to exercise his religious beliefs, and he presents no probative summary judgment evidence to the contrary.

iii.   Adverse Impact

The third *Turner* factor requires the Court to consider the impact the requested accommodation of plaintiff's asserted rights would have on other inmates, prison personnel, and the allocation of prison resources generally.  *Adkins*, 393 F.3d at 564.

According to Lumpkin, complying with plaintiff's request for a transfer to a JDU would have an adverse impact on prison staff, inmates, and the allocation of prison resources. "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner*, 482 U.S. at 90.  In this instance, plaintiff argues that he should not be required to meet Jewish eligibility and security requirements for transfer to a JDU.  The Court finds that under the facts of this case, it is apparent that accommodation of

17

an inmate's transfer request without compliance with the Chaplaincy Policy could have a significant and adverse impact on the internal security of the prison. Plaintiff admits to having a G-4 security level, which presents a higher security risk for prison safety. According to the affidavit testimony of Ms. Kempt, "G-4 inmates are higher-custody inmates in the TDCJ system, who require additional staffing and security arrangements." (Docket Entry No. 40-13, pp. 2–4.) Allowing inmates to transfer to JDUs without undergoing security clearance would jeopardize prison security, as well as adversely affect prison rehabilitation efforts.

It is also clear to the Court that granting prisoners transfers to a JDU without meeting application and eligibility requirements could have an adverse impact on allocation of prison resources. Housing at JDUs is limited, and is intended for prisoners who meet eligibility and security qualifications. Moreover, and as stated by Ms. Kempt in her affidavit, kosher meals are more expensive than regular prison meals, and requiring inmates to meet religious and security eligibility requirements for transfers to JDUs helps contain prison food costs.

Additionally, and as Lumpkin argues, granting plaintiff's transfer to a JDU without his completion of the application process or his meeting Jewish eligibility or security requirements would exhibit favoritism to one prisoner over others who have completed the application process and met eligibility and security requirements.

Granting inmates transfers to JDUs without completion of the application and approval process and in absence of meeting eligibility or security criteria would adversely

impact other inmates, prison personnel, security concerns, and the allocation of prison resources generally.  Plaintiff presents no probative summary judgment to the contrary.

      iv.    <u>Lower Impact Alternatives</u>

In the fourth and final *Turner* factor, the Court looks to whether there are ready alternatives to the regulation that would accommodate both plaintiff and the administrative needs of the prison.  *Adkins*, 393 F.3d at 564.  Plaintiff argues that the Chaplaincy Policy violates his free exercise rights by requiring his successful completion of 30 out of 45 Jewish study lessons in order to obtain access to the kosher foods required by his Hebrew Israelite faith.  Lumpkin contends that there are no alternatives to the Chaplaincy Policy that would be of lower impact to TDCJ's penological interests while accommodating plaintiff's religious need for kosher foods.  The Court must respectfully disagree with Lumpkin's argument.

If plaintiff were a prisoner who professed to being Jewish or wanted to convert to Judaism, or was otherwise an adherent to the Jewish faith and practices, the Court would agree with Lumpkin's argument.  However, plaintiff does not profess to being Jewish or wanting to convert to Judaism, to being an adherent to the Jewish faith in general, or in need of access to Jewish instruction, programming, or holy day services.  He requests transfer to a JDU solely in order to access kosher foods, which he states is necessary to meet his own non-Jewish religious requirements.  Lumpkin does not dispute that plaintiff's religious beliefs require consumption of kosher meals.  Thus, stated bluntly, AD-07.02 requires non-Jewish prisoners such as plaintiff to convert to Judaism under Jewish law (for transfer to an

Enhanced Jewish Designated Unit) or to complete an extensive course of Jewish studies (for transfer to a Basic Jewish Designated Unit) if they seek to consume kosher foods as a tenet of their non-Jewish religious faith. Nothing in the record or summary judgment pleadings indicate that the requisite Jewish studies would enhance or correspond with plaintiff's Hebrew Israelite faith. This eligibility criterion would appear at odds with TDCJ's stated policy in AD-07.30 (rev. 8) that, "No TDCJ employee, contractor, or volunteer shall disparage the religious beliefs of any inmate *or compel any inmate to make a change of faith preference.*" (Docket 40-12, p. 3, emphasis added.)

It appears to the Court that kosher foods could be made available to plaintiff for purchase in the commissary at his current prison unit, or he could be transferred to a non-JDU that already offers kosher foods for purchase in the commissary, assuming security and other housing needs were met.[2] Such accommodations would allow plaintiff access to kosher foods without needing to meet Jewish eligibility requirements. Moreover, by offering an assortment of pre-packaged kosher foods for sale in a limited number of non-JDU facilities, TDCJ could recoup the expense of providing non-Jewish prisoners access to kosher foods and avoid incurring additional food costs. These potential lower impact alternatives have not been explored by the parties in this summary judgment proceeding, and the Court is not

---

[2]Plaintiff requests, in part, transfer to a Basic Jewish Designated Unit where kosher foods are available only through commissary purchase at the prisoner's expense. By requesting such a transfer, he acknowledges that such arrangement would be satisfactory to his needs.

20

inclined to overlook these potential options even if they have not been proposed by plaintiff.[3]

This *Turner* factor weighs against constitutionality of the Chaplaincy Policy.  In light of this finding, and in the alternative, the Court declines to grant summary judgment in favor of Lumpkin as to constitutionality of the Chaplaincy Policy.

## V.  CONCLUSION

For the reasons shown above, defendant Bobby Lumpkin's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**, and this lawsuit is **DISMISSED WITH PREJUDICE** for failure to state a viable First Amendment claim for relief under section 1983.   Any and all pending motions are **DISMISSED AS MOOT**.

Signed at Houston, Texas, on this the *16*th day of March, 2023.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

---

[3]Plaintiff's pleadings show that he is under the impression that only the Wynne, Jester III, and Stiles Units have kosher foods available for purchase in the commissary, and Lumpkin neither disputes nor agrees with plaintiff's assertion.